IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JOHN WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 06-0540-CG-B |
| | ) |
| JACK TILLMAN, SAM COCHRAN, GLEN | ) |
| GARSIDE, ROBERT SMITH, FRED | ) |
| RICHARDSON, and WESLEY BARNETT | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter is before the court on the motion of Fred Richardson for summary judgment (Doc. 83), the motion of Jack Tillman for summary judgment (Doc. 86), the motion of Wesley Barnett, Glen Garside and Robert Smith for summary judgment (Doc. 87), the motion of Sam Cochran for summary judgment (Doc. 88), plaintiff's response to the above motions (Doc. 96), Barnett, Garside and Smith's reply (Doc. 100), and the motion of Barnett, Garside and Smith to strike the declarations of Clarissa Perkins and John Boykin (Doc. 99).   The court finds that defendants' motions for summary judgment are due to be granted.

## FACTS

Plaintiff, John Wilson, filed this case seeking damages pursuant to 42 U.S.C. § 1983 for injuries he received on October 8, 2005, after being pulled over for a traffic stop by defendant, Officer Robert Smith.  In his complaint, the plaintiff recounts the incident as follows:

> I was pulled over for what was supposedly a routine traffic stop, while I was going home from work, and from picking up my 9 year old son.  I was asked to give the Officer my Driver's Licence at which point I informed the Officer that I only had a State I.D. yet, the Officer took it and went to do his routine checks,

> minutes later, another squad car pulled up, and the officers then approached my still running vehicle. Officer Garside then asked me to exit my car. I asked Why? He stated that I had a pending Robbery and Probation Warrant. I proceeded at that time to shut my car down, which has two(2) switches, upon attempting to release my key from the ignition, it would not do so, because the floor shifter had not disengaged the key lock to remove it. I then reached up to push it up to release the key, when the officers reached into the car, and began to assault me, without even letting me try to explain, causing me to try to cover my face. Officer Garside while hitting me and trying to control me knocked or pulled my car into gear, causing my car to roll. Officer Smith who was back officer, reached into the car to gain control over the car's steering wheel, pulling it toward the him/or to the left causing my car to jump curb knocking both officers down to the ground. Officer Smith called for back-up, while my 9 year old son in the car wondering what was going on, as the officers had not said barely a word. They just acted without any cause. I exited the vehicle after checking my son, to check the damage to the car, when the officer began to order me to get down. As I began to comply I noticed Officer Garside had already fired his taser puncturing my right side. Then at that moment he tased me. I went to the ground instantly, while Officer Garside standing over me, demanded me not to move, or he'll hit my ass with another 5,000 volts. He then did it again while I was already down and in compliance and at no time made any attempt to move or resist. Officer Garside then handcuffed me as other officers began to rush me, they then drug in the dirt ripping and tearing my clothes. They kicked and I had no way to defend my self or pose a threat to any of the officers and they made remarks or comments against me out of character. I was kicked in the head, and left rib cage causing damage to ribs and swelling to my head. Then they took me to police van, where I was thrown/tossed in the back by officer and taken to headquarters, without nary a word to my son, no explanation being given to my son, no care in the world about my son witnessing all of their actions.

(Doc. 5, p. 6) (spelling and some punctuation errors were corrected). Plaintiff's complaint further reports that he was taken to the hospital for treatment and was treated and taken back to the metro jail. The complaint asserts that defendant, Jack Tillman, is responsible for not reporting this incident to the Internal Affairs Division or Alabama Bureau of Investigation. Defendant, Sam Cochran, is alleged to be responsible for the actions of the officers as chief of police for the City of Mobile and for not training Officer Garside properly. Plaintiff alleges that Officer Garside is responsible for using the taser twice on the plaintiff, including once when the plaintiff was already on the ground, for assaulting plaintiff in his car in the presence of his son,

and for allowing the plaintiff to be kicked and drug by other officers.  Officer Smith is allegedly responsible for making no attempt to stop Officer Garside and other officers from assaulting plaintiff.  Lastly, Mr. Fred Richardson, as the Chairman of Public Safety, is alleged to be responsible for the actions of the police officers who work for the City of Mobile.

The plaintiff stated at his deposition that at the time of the incident he was on probation and had been serving time for a first-degree robbery charge. (Wilson Depo. pp. 9-10).  Plaintiff stated that when he reached for the floor shifter that he "guess[es] [the officer] thought I was trying to pull off." (Wilson Depo. p. 12).  According to plaintiff, after the car was switched into gear during the tussle, his foot slipped off the brake. (Wilson Depo. p. 12).  Plaintiff testified that when he reached down to push the shift forward, the officer "came in through the window and started trying to grab me like he was trying to pull me out of the car", they "tussled" and then the officer struck him in the face. (Wilson Depo. p. 14).  The other officer reportedly "came through the window and was trying to take the key out." (Wilson Depo. pp. 14-15).  The car started to roll and the officer who reached in broke the key off and the other officer pulled on the steering wheel. (Wilson Depo. p. 16).  When the car jumped the curb, both officers fell and were laying on the ground. (Wilson Depo. p. 16).  The car rolled across the street, hit the curb, and went under a chain link fence before it finally came to a stop.  (Wilson Depo. pp. 19, 21 ). "When the car started to roll away, the only thing [the officers were] doing was trying to get [plaintiff] out of the car, trying to stop the car." (Wilson Depo. p. 20).  Plaintiff testified that when the car stopped, plaintiff got out of the car, stepped over the officers and walked around and looked at the front of the car. (Wilson Depo. p. 23).  While he was walking around to look at the car, one of the officers said "hey, hey," and plaintiff turned around and saw that the officer had pulled his taser out. (Wilson Depo. p. 24).  The plaintiff reports that he then walked away

from the vehicle "to draw the officers away from his son." (Wilson Depo. p. 24). Plaintiff testified that he was "a good distance from the vehicle" when he first realized that he had been hit with the taser prongs. (Wilson Depo. p. 25). Plaintiff did not feel it when he was hit with the prongs but then the officer engaged the taser and he went down and the officer said "don't move" and then engaged the taser again. (Wilson Depo. pp. 25-27). The plaintiff does not know which officer handcuffed him, or which officer kicked him. (Wilson Depo. p. 28). About three officers hoisted him up, carried him holding him by his cuffs and the back of his pants leg, let him fall to the ground, and dragged him to a police van. (Wilson Depo. p. 30-34). One of the officers hit him in the head with his boot heel while he was walking. (Wilson Depo. p. 33). Plaintiff testified that the first time the boot hit him, it was probably an accident, but it happened twice. (Wilson Depo. pp. 35-36). A bicycle medic that was down for Bay Fest came to look at plaintiff, but said plaintiff was all right. (Wilson Depo. p. 36-37). Wilson was taken to headquarters and he waited there for about an hour and was questioned about general information. (Wilson Depo. pp. 38, 40). Plaintiff was then taken to the county jail, but the docket clerk said he needed to be taken to the hospital and checked before admitting him into the jail. (Wilson Depo. pp. 42-43). At the hospital, they checked plaintiff's vital signs and gave him an MRI or a CT scan. (Wilson Depo. pp. 43-44). The hospital never told him he had anything wrong or what type of damage was done and just sent him back to the metro jail. (Wilson Depo. p. 44). Plaintiff never talked to defendants Sam Cochran or Fred Richardson about what happened. (Wilson Depo. p. 54).

The officers report that after pulling plaintiff over, they discovered that he had three felony warrants and asked the plaintiff to step out of the vehicle (Garside Aff. §§ 2, 3; Smith Aff. § 3). According to the officers, the plaintiff started to get out of the vehicle, but then suddenly

4

jumped back into the car. (Smith Aff. § 3; Garside Aff. § 3). The officers thought plaintiff was trying to evade arrest by driving off. (Smith Aff. § 3; Garside Aff. § 3). The officers attempted to stop plaintiff from driving off and reached in to pull the child in the passenger seat back into the car so he would not fall out as the car lunged forward. (Garside Aff. § 3). As the car moved forward, Officer Garside was toppled on his side and somehow became entangled with the moving vehicle. (Garside Aff. § 3). Officer Smith was also hung up on the car. (Garside Aff. § 3). Garside's left shoulder hit the curb and his collarbone broke. (Garside Aff. § 3). After the car went through the fence, the car finally struck a pile of steel rods and came to a stop and the officers fell to the ground. (Smith Aff. § 3; Garside Aff. § 3-4). Officer Smith's foot was injured when it was run over by the left rear tire. (Smith Aff. § 3). According to the officers, plaintiff exited the vehicle, striking Officer Smith in the head with his foot as he walked over him. (Smith Aff. § 3; Garside Aff. § 3). Officer Smith reportedly told the plaintiff to get down on the ground, but the plaintiff continued to run away, taunting the officers to come get him. (Smith Aff. § 3; Garside Aff. § 4). The officers pursued the plaintiff and Smith repeatedly ordered the plaintiff to stay down and put his hands behind his back. (Garside Aff. § 4). According to the officers, the plaintiff refused and reached for something on his side. (Garside Aff. § 4). Officer Smith hit the plaintiff with his taser. (Smith Aff. § 3; Garside Aff. § 3). Officer Garside tried to handcuff the plaintiff, but due to his broken collarbone, was unable to use his arm. (Garside Aff. § 4). Plaintiff was reportedly ignoring Smith's instructions to stay down and place his hands behind his back and was reaching underneath him and started to get up again. (Smith Aff. § 3). Smith then engaged the taser a second time. (Smith Aff. § 3). Other officers arrived on the scene and secured the plaintiff in handcuffs. (Smith Aff. § 3). Neither Smith, nor Garside were involved in plaintiff being handcuffed or transported to the police vehicle. (Smith Aff. § 3;

Garside Aff. § 4).

## LEGAL ANALYSIS

### A. Motions to Strike

Defendants moved to strike the declarations of Clarissa Perkins (Doc. 39) and John Boykin (Doc. 53) asserting that they contain inadmissable hearsay. The majority of Perkins' declaration discusses her efforts to locate the plaintiff after she heard that he had been seen getting in the back of a police car. She indicates that the plaintiff was not booked into the metro jail for many hours after his reported arrest. She states that the plaintiff finally called her at 2:00 a.m. and indicates what the plaintiff told her happened. Ms. Perkins also states that she talked to "someone" at Internal Affairs about the incident. Affidavits submitted in support of or in opposition to summary judgment must be based on personal knowledge. FED. R. CIV. P. 56(e). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Macuba v. DeBoer, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation and internal quotation and footnote omitted). Hearsay is a statement made by someone other than the declarant, offered to prove the truth of the matter asserted. See FED.R.EVID. 801(c). Ms. Perkins did not witness the incident and has no personal knowledge of what happened during the confrontation between plaintiff and the officers. The court cannot consider statements by Ms. Perkins concerning what someone else told her and those portions of her declaration are hereby **STRICKEN**.

Mr. Boykin is apparently the plaintiff's father and his declaration states that his son was beaten and tazed, that his grandson was a witness, and that it was at least 7 hours before plaintiff was booked into the jail. (Doc. 53). Mr. Boykin does not explain how he purports to know what

happened. Boykin apparently did not witness the incident and his personal beliefs are inadmissible. "Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, 'upon information and belief' – instead of only knowledge– from raising genuine issues of fact sufficient to defeat summary judgment." Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002) (citations omitted). Therefore, Mr. Boykin's declaration is hereby **STRICKEN.**

**B. Motions for Summary Judgment**

    **1. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted: "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, at 249-250. (internal citations omitted).

The basic issue before the Court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists.

O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).   "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment."  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The non-moving party "may not rest on the mere allegations or denials of the [non-moving] party's pleading, but .... must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e)  "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

### 2. Claims against Jack Tillman

Defendant, Jack Tillman, was the Sheriff of Mobile County at the time plaintiff was

arrested.  However, as defendant points out, the plaintiff was not arrested by Mobile County Sheriff officers, but by officers for the City of Mobile.  Sheriff Tillman was charged with the responsibility of maintaining the Mobile County Metro Jail, but there has been no allegation that the Metro Jail was involved in any wrongdoing with regard to the incident that occurred on October 8, 2005.  Plaintiff asserts in his complaint that Jack Tillman is responsible for not reporting this incident to the Internal Affairs Division or Alabama Bureau of Investigation.  However, there is no evidence that Jack Tillman had any personal knowledge of the incident.  There is also no evidence that Tillman or any Metro Jail personnel prevented the plaintiff from lodging a complaint against the City of Mobile Police Department or the individual police officers that were involved.  Moreover, to the extent Sheriff Tillman is sued in his official capacity, he is generally entitled to Eleventh Amendment immunity. See Weaver v. Mobile County, 228 Fed. Appx. 883, 886 n. 8 (11th Cir. 2007).  Additionally, Tillman cannot be held liable under § 1983 on the basis of respondeat superior or vicarious liability and there has been no causal connection shown between Tillman's actions or inactions and any alleged constitutional injury. See Gray ex rel Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006), cert. denied, --- U.S. ----, 127 S.Ct. 2428, 167 L.Ed.2d 1129 (2007) (citing Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).  Tillman would also be protected by qualified immunity which, as will be discussed in more detail below, offers a complete protection for governmental officials sued in their individual capacities if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Bostic, 458 F.3d 1295 at 1303 (quoting Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)).

**3. Claims against Sam Cochran**

The complaint alleges that Sam Cochran is responsible for the actions of the officers as Chief of Police for the City of Mobile.   As mentioned above with regard to defendant Jack Tillman,  "[s]upervisory officials are not liable under section 1983 on the basis of respondeat

9

superior or vicarious liability." Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994). The standard by which a supervisor is held liable in his or her individual capacity for the actions of a subordinate is "extremely rigorous." Gonzalez v. Reno, 325 F .3d 1228, 1234 (11th Cir. 2003) (citing Braddy v. Florida Dep't of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998)). "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).   There is no allegation or evidence that Cochran personally participated in the alleged constitutional violation.  Plaintiff apparently asserts that there is a causal connection between his injuries and Cochran's failure to properly train the officers.  A plaintiff can establish the necessary causal connection in one of three ways.  First, by showing that "a history of widespread abuse put[ ] the responsible supervisor on notice of the need to correct the alleged deprivation, and he fail[ed] to do so." Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation omitted). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  Brown v. Crawford, 906 F.2d 667, 671 (11th Cir.1990). A plaintiff can also establish the necessary causal connection by showing "facts which support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003).  Finally, a plaintiff can establish a causal connection by showing that a supervisor's "custom or policy ... resulted in deliberate indifference to constitutional rights," Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir.1991).  Plaintiff has offered no evidence to support any of these means of proving a causal connection.  There is no evidence of widespread abuse, no evidence Cochran directed the officers or knew that the officers would act unlawfully and there is no evidence concerning a custom or policy.  Plaintiff merely alleged in his complaint that Sam Cochran failed to properly train the officers.  This

conclusory allegation is insufficient to survive summary judgment.

### 4. Claims against Officers Smith, Garside, and Barnett

Plaintiff asserts claims for excessive force and child endangerment against the officers in their official and individual capacity. When an officer is sued under § 1983 in his official capacity, the suit is simply "another way of pleading an action against an entity of which an officer is an agent." Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (quoting Kentucky v. Graham, 473 U.S. 159,  165, 105 S.Ct. 3099, 3105 , 87 L.Ed.2d 114 (1985)[internal quotations omitted]).  "Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents. Id. (citations omitted).

In order to state a claim under § 1983 against the City of Mobile, plaintiff must allege that he suffered a constitutional injury, and that his injury was caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dept. of Soc. Servs., 436 U.S. 658, 690 (1978).  A municipality cannot be held liable under §1983 solely because it employs a tortfeasor. Id. at 2035.   In Board of the County Commissioners of Bryan County v. Brown, 520 U.S. 397, 117 S.Ct. 1382 (1997), the test set out above by Monell was subsequently narrowed by the Supreme Court when it stated:

> [I]t is not enough for a § 1983 plaintiff to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

Brown, 520 U.S. at 404, 117 S.Ct. at 1388.   The plaintiff's burden is heavy.  As noted by the Eleventh Circuit Court of Appeals:

> This high standard of proof is intentionally onerous for plaintiffs; imposing liability on a municipality without proof that a specific policy caused a particular violation would equate to subjecting the municipality to respondeat superior liability-a result never intended by section 1983. As the Supreme Court has explained, '[t]o adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city

> employee, a § 1983 plaintiff will be able to point to something the city "could have done" to prevent the unfortunate incident. Thus, permitting cases against cities for their "failure to train" employees to go forward under § 1983 on a lesser standard of fault would result in de facto respondeat superior liability on municipalities ....' " (citing City of Canton [v. Harris], 109 S.Ct. [1197] at 1206 [(1989)]); see also Brown, [520 U.S.] at 415-16, 117 S.Ct. at 1394 ("Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability.").

Gold v. City of Miami, 151 F.3d 1346, 1351 n. 10 (11th Cir. 1998). Under § 1983, the "requisite degree of culpability" is that the municipality acted with at least "deliberate indifference" to the consequences of its actions. For instance, evidence concerning an applicant's background may have made a person a poor candidate for an officer; but nevertheless, the municipality cannot be held liable for deliberate indifference unless the plaintiffs demonstrate that the decision to hire reflected a conscious disregard for a high risk that the officer would use excessive force in violation of the plaintiff's federally protected right. Brown, 520 U.S. at 414. Plaintiff must show not only that the municipal officers violated their constitutional rights, but that the City of Mobile's policies were the "moving force" behind his injury. "A finding of culpability cannot depend simply on the mere probability that any officer inadequately screened will inflict any constitutional injury, but must instead depend on a finding that the particular officer was 'highly likely to inflict the particular injury suffered by the plaintiff.'" Romero v. City of Clanton, 220 F.Supp.2d 1313, 1317 (M.D. Ala. 2002) (quoting Brown, 520 U.S. at 412) (emphasis in original). "[O]nly where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the 'plainly obvious consequence of the decision to hire the applicant would be a deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute deliberate indifference.'" Raby v. Baptist Medical Center, 21 F.Supp.2d 1341, 1353 (M.D. Ala. 1998) (quoting Brown, 520 U.S. at 411).

To show an unconstitutional policy or custom, plaintiff must identify the policy or custom, connect the policy or custom with the government entity itself, and show that the particular injury was incurred because of the execution of that policy. Bennett v. City of Slidell,

12

728 F.2d 762, 767 (5th Cir. 1984)(en banc).  Thus, the city of Mobile is not automatically liable under § 1983 even if it inadequately hired, trained or supervised its police officers and those officers violated plaintiffs' constitutional rights.  If plaintiff fails to allege an official policy or custom, then his claim against the municipality is subject to dismissal. See Meadowbriar Home for Children, Inc. v. Gunn, 81 F.3d 521, 532-33 (5th Cir. 1996).  Moreover, the Eleventh Circuit has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise. Church v. City of Huntsville, 30 F.3d 1332, 1342-46 (11th Cir. 1994), (holding that the plaintiffs were not likely to succeed on the merits of their failure-to-train claim without proof that the City was aware of a prior incident in which constitutional rights were similarly violated); see also Popham v. City of Talladega, 908 F.2d 1561, 1564-65 (11th Cir. 1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train).

In this case, plaintiff does not identify any specific policies or customs promulgated by the City of Mobile.   Plaintiff has also failed to establish that any municipal policy or custom was the "moving force" behind any alleged constitutional violation.  Nor has plaintiff shown, or even argued, that the claimed injuries are plainly obvious consequences of the City of Mobile's hiring, supervision, or training decisions.   Therefore, the court finds that summary judgment is due to be granted as to plaintiff's claim against the City of Mobile and/or Officers Smith, Garside and Barnett  in their official capacity.

As to plaintiff's claims against Smith, Garside and Barnett in their individual capacity, the officers assert that they are entitled to qualified immunity.  "Qualified immunity protects government officials performing discretionary functions from civil trials ... and from liability if their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (internal quotations and citations omitted).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear

of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

To receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).  Here, it is clear that the officers were acting within the course and scope of their discretionary authority in pulling the plaintiff over in a traffic stop, arresting plaintiff and transporting him to headquarters and to the metro jail.  Plaintiff has offered no evidence or even alleged that the officer's stop was anything other than a routine police stop. "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Id.

In considering the merits of a qualified immunity defense in excessive force cases, courts previously considered whether the right was clearly established and, if so, whether, in light of such clearly established law, a reasonable officer could have known that his/her conduct was unlawful. See Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001) (citing Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).  However, the Supreme Court revisited the above analysis, clarifying the sequence of inquiries for qualified immunity cases. Id.

The Supreme Court held in Saucier that a qualified immunity analysis must begin with the threshold determination of whether, based upon the facts taken in the light most favorable to the party asserting the injury, the officer's conduct violates a constitutional right. Id. at 201; Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508 (2002).  If no constitutional right was violated, the court need not inquire further. Id.  If, however, a constitutional violation occurred, the court must then determine whether the right was clearly established. Id.

In considering the first step of <u>Saucier's</u> two-step qualified immunity inquiry, we must determine whether plaintiff's constitutional right to be free from excessive force was violated under the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the circumstances. <u>Graham v. Connor</u>, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  The court, in making this determination, must presume that the plaintiff's version of events is true.  <u>See</u> <u>Hope</u>, 536 U.S. at 736 (The threshold inquiry is "whether plaintiff's allegations, <u>if</u> <u>true</u>, establish a constitutional violation." emphasis added).  The Supreme Court described the "objectively reasonable" standard to be applied in such excessive force cases as follows:

>  Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the countervailing governmental interests at stake. <u>Id.</u>, at 8, 105 S.Ct., at 1699, quoting <u>United States v. Place</u>, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).  Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. <u>See</u> <u>Terry v. Ohio</u>, 392 U.S.[1], at 22-27 [(U.S. Ohio 1968)], 88 S.Ct. [1868], at 1880-1883 [(1968)].  Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," <u>Bell v. Wolfish</u>, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. <u>See</u> <u>Tennessee v. Garner</u>, 471 U.S. [1], at 8-9 [(1985)], 105 S.Ct.[1694], at 1699-1700 [(1985)] (the question is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure").
>
>  The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. <u>See</u> <u>Terry v. Ohio, supra</u>, 392 U.S., at 20-22, 88 S.Ct., at 1879-1881. . . .   With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," <u>Johnson v. Glick</u>, 481 F.2d [1028], at 1033 [(2d Cir. 1973)], violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
>
>  As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the

> officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139, 98 S.Ct. 1717, 1723-1724, 56 L.Ed.2d 168 (1978); see also Terry v. Ohio, supra, 392 U.S., at 21, 88 S.Ct., at 1879 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, 436 U.S., at 138, 98 S.Ct., at 1723, citing United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

Graham, 490 U.S. at 396-397, 109 S.Ct. at 1871-1872.  "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand" Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir.2002) (internal quotation marks omitted).  "If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205.

In the instant case, there is no evidence that the plaintiff was injured from the incident. Plaintiff was checked by a medic at the scene, who said he was "fine."   He was taken to the hospital before being booked into jail.  A report from the hospital submitted by plaintiff indicates that plaintiff was given a CT scan of his brain which found:

> The basal cisterns and ventricles are patent and within normal limits.  There is no cerebral or cerebellar parenchymal abnormality.  There is no evidence of hemorrhage, mass effect or midline shift.  There is fluid seen within the right maxillary sinus. The paranasal sinuses are clear.  The remaining bony structures and soft tissues are unremarkable.
> Impression: fluid seen within the right maxillary sinus.  The case was discussed with the emergency room doctor who notes that patient has no facial tenderness. This likely represents sinus disease.

(Doc. 98, p. 18).  While there has been no expert testimony to explain the above doctor's notes, the report does not appear to support a finding that plaintiff was injured.  In fact, the doctor appears to have found only that the plaintiff had an unrelated sinus problem.  The other medical documents submitted by plaintiff indicate that plaintiff was merely advised to take Tylenol. (Doc. 98, p. 23).  The court finds that plaintiff's injuries were so minor as to be considered de

16

minimis. See, e.g., Vinyard v. Wilson, 311 F.3d 1340, 1349 n. 4 (11th Cir. 2002) (noting a strong argument that "minor bruising" is de minimis injury); Nolin v. Isbell, 207 F.3d 1253, 1258 n. 4(11th Cir. 2000) (finding de minimis force when "minor bruising" along with minimal force).  The use of de minimis force constitutes a violation of the Fourth Amendment only if the officer was not entitled to arrest or detain the plaintiff.  Reese v. Herbert, 527 F.3d 1253, 1272 (11th Cir. 2008).  Plaintiff has not challenged the basis for his arrest.  De minimis force, without more, cannot constitute a Fourth Amendment violation if the basis of the arrest is not challenged. Nolin, 207 F.3d at 1257 (reaffirming that after Graham, the de minimis principle still applies). Under the de minimis principle, "a minimal amount of force and injury ... will not defeat an officer's qualified immunity in an excessive force case." Nolin, 207 F.3d at 1258.

Indeed, even if the force was unnecessary, if "the actual force used and the injury inflicted were both minor in nature .... the application of the excessive force standard would not inevitably lead an official in [the defendant's] position to conclude that the force was unlawful." Id. at 1256-57 (discussing and quoting Jones v. City of Dothan, 121 F.3d 1456, 1460-61 (11th Cir. 1997) (per curiam)); Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003).

In the instant case, the plaintiff admits that, under the circumstances, the officers probably thought he was trying to drive away.  He also admits that when the car finally came to a stop, he got out and walked away from the car to attempt to draw the officers away from the child in the car.  The plaintiff had repeatedly ignored the officers' instructions and it was clearly reasonable for the officers to believe that the plaintiff was attempting to evade arrest.  In a "difficult, tense and uncertain situation" the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force.  Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004).  Additionally, as discussed above, there is also no evidence that plaintiff received any more than a de minimis injury.  Thus, even if the force used was unnecessary, the de minimus force did not constitute a violation of the Fourth Amendment where, as here, it has not been alleged that the officer was

not entitled to detain or arrest the plaintiff. Thus, the court finds that excessive force was not used.

If the court had determined that defendants violated plaintiff's Fourth Amendment rights, the court must then turn to the second step in the analysis, whether those rights were clearly established. Even if the court were to hold that the officers violated the Fourth Amendment, the officers are still entitled to immunity if their actions resulted from reasonable mistakes as to the legality of their actions. Id. at 206. "[T]he law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The plaintiff may not discharge his burden "by referring to general rules and to the violation of abstract 'rights'." Id. at 1150. Qualified immunity is evaluated on the basis of what the official knew at the time of the challenged action, not "by hindsight, based on later events." Id. at 1150. A plaintiff can establish that the state of the law provided clear notice or warning to the officers that the conduct was unconstitutional by submitting fact-specific precedents, or demonstrating that the very conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent." Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting Lee, 284 F.3d at 1199).

Thus, even if the force used is found to be excessive, the officers are still entitled to immunity if their actions resulted from reasonable mistakes as to the legality of those actions. The court finds that the law was not so concrete and factually defined to make it obvious to the officers that what they were doing violated federal law. Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Any unlawfulness of the officers' conduct was not readily apparent. Therefore, summary judgment is due to be granted as to plaintiffs excessive force claims against the officers.

As to plaintiff's state law claim of child endangerment, that claim is barred by the statutory immunity afforded to the officers. Under Alabama law, municipal police officers are afforded "immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." ALA. CODE § 6-5-338 (1975). "Alabama law has defined discretionary acts as [t]hose acts [as to which] there is no hard and fast rule as to course of conduct that one must or must not take and those requiring exercise in judgment and choice and [involving] what is just and proper under the circumstances." Montgomery v. City of Montgomery, 732 So.2d 305, 310 -311 (Ala.Civ.App. 1999) (citations and internal quotations omitted). In the instant case, the officers were clearly engaged in a discretionary function within the line and scop of their law enforcement duties. See Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). ("Because making an arrest is within the official responsibilities of a sheriff's deputy, Terry was performing a discretionary function when he arrested Crosby."). Since the officers' conduct constituted discretionary acts within the line and scope of their duties, the officers are entitled to discretionary immunity unless the plaintiff can demonstrate that the officers' conduct "is so egregious as to amount to malicious conduct or conduct engaged in bad faith." Couch v. City of Sheffield, 708 So.2d 144, 153 (Ala. 1998) (citation omitted). There is no evidence that officers Smith, Garside or Barnett acted in bad faith or maliciously. Therefore, the court finds that the officers are entitled to discretionary immunity under ALA. CODE. § 6-5-338. As such, summary judgment is due to be granted in favor of the officers as to plaintiff's state law claim.

**5. Claims against Fred Richardson**

Lastly, Mr. Fred Richardson, as the Chairman of Public Safety, is alleged to be responsible for the actions of the police officers who work for the City of Mobile. However, there is no evidence Richardson had any knowledge of or connection in anyway to the incident in question. Mr. Richardson submitted an affidavit stating that he serves on the City Council of

the City of Mobile and that his duties are entirely legislative in nature. (Richardson Aff. ¶ 2). Richardson serves as Chairman of the Public Safety Committee, but his duties do not include hiring, supervision, or training of police officers. (Id.). Plaintiff has failed to allege any facts or present any authority that show he is entitled to relief against Mr. Richardson. Therefore, summary judgment is due to be granted in favor of Mr. Richardson.

## CONCLUSION

For the reasons stated above, the motion of Fred Richardson for summary judgment (Doc. 83), the motion of Jack Tillman for summary judgment (Doc. 86), the motion of Wesley Barnett, Glen Garside and Robert Smith for summary judgment (Doc. 87), and the motion of Sam Cochran for summary judgment (Doc. 88), are hereby **GRANTED**.

**DONE and ORDERED** this 7th day of May, 2009.

/s/ Callie V. S. Granade
CHIEF UNITED STATES DISTRICT JUDGE